AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
District of Delaware

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. 09- 141 M |
| PAUL TAYLOR | ) | CR 09-121-JJF |
| | ) | |
| *Defendant* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of _____ in the county of _____ in the _____ District of _____, the defendant violated _____ U. S. C. § _____ , an offense described as follows:

### SEE ATTACHMENT

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Harry Ubele
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 12/11/2009 _____

_____
*Judge's signature*

City and state: _____ Wilmington, Delaware

Honorable Mary P. Thynge
*Printed name and title*

## CRIMINAL COMPLAINT OFFENSES ATTACHMENT

### COUNT I

From in or about February 2008, to in or about August 2008, in the District of Delaware and elsewhere, defendant **Paul Taylor**, knowingly and willfully caused the export from the United States to Austria of a defense article, that is, an anti-gravity flight suit, which is designated as a defense article on the United States Munitions List, without the required license or written authorization from the Department of State, Directorate of Defense Trade Control, having first been obtained for such export, in violation of Title 22, United States Code, Sections 2778 (b)(2) and 2778(c), and Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1(a)(1).

### COUNT II

From in or about August 2008 to in or about February 2009, in the District of Delaware and elsewhere, defendant **Paul Taylor**, knowingly and willfully caused the export from the United States to Austria of a defense article, that is, one HGU-55/P fighter pilot helmet, which is designated as a defense article on the United States Munitions List, without the required license or written authorization from the Department of State, Directorate of Defense Trade Control, having first been obtained for such export, in violation of Title 22, United States Code, Sections 2778 (b)(2) and 2778(c), and Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1(a)(1).

1

## COUNT III

From in or about March 2009 to on or about July 2009, in the District of Delaware and elsewhere, defendant **Paul Taylor**, knowingly and willfully attempted to export and attempted to cause the export from the United States to Denmark, a defense article, that is, an F-14 fighter ejection seat, which is designated as a defense article on the United States Munitions List, without the required license or written authorization from the Department of State, Directorate of Defense Trade Control, having first been obtained for such export, in violation of Title 22, United States Code, Sections 2778 (b)(2) and 2778(c), and Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1(a)(1).

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Harry C. Ubele, being duly sworn, state the following:

### A. Introduction and Agent Background

1.      I am a Special Agent with the Department of Homeland Security
(DHS), United States Immigration and Customs Enforcement (ICE) assigned to the Special
Agent in Charge (SAC) Philadelphia Office and I have been a Law Enforcement Officer for
approximately seven (7) years. In that capacity, I have conducted numerous criminal
investigations involving the violation of federal export control laws, money laundering, illegal
importation of narcotics and other laws. I am responsible for investigating, among other
activities, crimes involving the exportation of arms and technology, which are regulated under
applicable federal statutes based on their nature, the nature of their intended use, and/or the
identity of their end user. As a result of my training and experience, I am familiar with violations
of the laws relating to the unlawful export of goods or technology to destinations outside the
United States. Because this affidavit is being submitted for the limited purpose of establishing
probable cause to obtain a criminal complaint and arrest warrant, I have not included every
aspect of the investigation.

2.      I have been the case agent in this current investigation since February of 2008.
From my participation in this investigation and from reports made to me by other special agents,
as well as by other law enforcement authorities, and from my review of documents and other
evidence, I am thoroughly familiar with the facts and circumstances of this investigation.

3.      The Arms Export Control Act (AECA) authorizes the President of the United
States to control the export of "defense articles and defense services." 22 U.S.C. § 2778 (a)(I).
AECA also gives the President authority to designate items as "defense articles." Id. The

1

sCase 1:09-cr-00121-LPS Document 2 Filed 12/11/09 Page 5 of 29 PageID #: 8

statutory authority of the President to promulgate regulations with respect to exports of defense articles and defense services was delegated to the State Department, and the regulations are administered by the Directorate of Defense Trade Controls within the State Department. Under AECA and the International Traffic in Arms Regulations (ITAR), it is unlawful to export or attempt to export, or to re-export, U.S. origin articles that have been designated defense articles, without a license. In order to prove that Defendant committed an offense under AECA and ITAR, the government must prove beyond a reasonable doubt that Defendant exported, attempted to export or caused to be exported from the United States a defense article; the defendant did not obtain a license or written approval for the export from the State Department; and the defendant acted willfully (that is, with knowledge that his conduct was unlawful).

4.     The U.S. defense articles are an Anti-Gravity (Anti-G) Flight Suit, an HGU-55/P Fighter Pilot Helmet, four MBU-20/P oxygen masks and an F-14 (GRU-7A) Ejection Seat.

a. The Anti-G Flight Suit is a United States Munitions List Article X (a) (3) Item. Fighter pilots wear Anti-G Flight Suits to counteract the forces of gravity and acceleration.

b. The HGU-55/P helmets are lightweight helmets designed for the g-forces encountered in high-performance, fixed-wing jet aircraft. The HGU-55/P is a United States Munitions List Article X (a) (6) item.

c. The MBU-20/P's are oxygen masks designed for use in pressure breathing for g-force equipped fighter aircraft. The MBU- 20/P's are listed under the United States Munitions List Article X (d).

d. The F-14 (GRU-7A) ejection seat is a United States Munitions List Article VIII

2

(h) Item.

5.    ICE Agents have determined that Taylor does not have a license or written approval from the Department of State, Directorate of Defense Trade Control to export goods or technology outside the United States.

6.    Based on the facts set forth in this affidavit, there is probable cause to believe that Paul Taylor, hereafter referred to as "Taylor," has knowingly and willfully violated Title 22, United States Code, Sections 2778 (b)(2) and 2778 (c), and Title 18, United States Code 2, and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1(a)(1) by causing the export of United States defense articles without the requisite export license.

**B.    Investigation**

7.    In October, 2007, ICE Agents received information regarding Paul Taylor and his exporting U.S. manufactured defense articles on eBay without obtaining the required license(s).

8.    On or about February 18, 2008, undercover agent number one (herein referred to as UCA1) initiated email communication with Taylor at his eBay contact asking him for his telephone number to discuss the Anti-gravity Flight Suit Taylor had for sale on eBay.[1] Taylor subsequently provided the telephone number (626) 318-3787.

9.    On or about May 6, 2008, UCA1 made a consensual telephone call to TAYLOR and left a voicemail for Taylor. Taylor subsequently returned UCA1's telephone call. The two discussed the purchase and shipment of the Anti-Gravity Flight Suit to Vienna, Austria. Taylor stated that he did not need any paperwork in order to ship the Anti-Gravity Flight Suit outside the United States and that if the United States wanted to come after him for this, then they could,

---

[1] All of the communications between UCA1 and Taylor were consensually monitored and, with the exception of one phone communication, consensually recorded by UCA1.

3

because he said he was just a small businessman and the U.S. wouldn't get much out of him as he was just trying to make some money on the side. Taylor stated that the total cost for the Anti-Gravity Flight Suit, including shipping charges, would be $184.00 U.S. Dollars. Taylor provided his website, www.customflighthelmets.com. Taylor stated that the helmets were on the U.S. Munitions List, and that the Department of Defense was cracking down on exporters because such items were falling into the wrong hands. He further stated that some eBay users were putting disclaimers on their Ebay accounts because they are getting paranoid. Taylor also stated that the helmets were not supposed to go overseas. UCA1 asked if he would send the helmets and other items to him in Vienna, Austria. Taylor stated, "I don't give a fuck" and laughed after he made the statement. UCA1 further asked if Taylor would be able to sell them without filing out any papers. Taylor laughed and stated that it would not be a problem, but only it would cost more because of International shipping charges.

10.     On or about June 10, 2008, UCA1 made a telephone call to Taylor, during which UCA1 and Taylor had a conversation regarding the Anti-Gravity Flight Suit. UCA1 told TAYLOR that he was going to send him a check for $184 for the flight suit, to include the International shipping charges. UCA1 reiterated that he wanted the Anti-Gravity Flight Suit shipped to Vienna. TAYLOR told UCA1 to send the address with the check and then Taylor would send him the tracking number. Taylor stated that he would undervalue the shipment by $20 U.S. Dollars, would list the item as a "Flight Suit" only, and wouldn't put "Anti-G" on the Customs paperwork. Taylor said that he never had any problems with Customs and didn't expect to have one in reference to this shipment.

11.     On or about June 13, 2008, ICE/Philadelphia mailed a check in the amount of $184 U.S. Dollars to Paul Taylor at 2818 Larkfield Avenue, Arcadia, CA 90006. The checkwas drawn

4

on an ICE/Philadelphia undercover bank account located in Wilmington, Delaware. UCA1 also sent Taylor an email to Taylor's email account, surplusagent@aol.com (hereinafter referred to as Taylor's email address) , confirming that he sent the check.

12. On or about July 9, 2008, UCA1 sent an email to Taylor's email address confirming the shipment address in Vienna, Austria. UCA1 further requested a tracking number for the package.

13. On or about July 28, 2008, ICE/Vienna, Austria received the shipment sent by Taylor. The shipment contained the one Anti-Gravity Flight Suit.

14. On or about August 4, 2008, ICE/Philadelphia received the shipment from ICE/Vienna, Austria where it was stored as evidence.

15. On or about August 4, 2008, UCA1 sent an email to Taylor stating that the G-suit arrived in Vienna without any problems. UCA1also asked Taylor if there was a good time to call regarding the HGU-68/P Fighter Pilot Helmets. Taylor had previously initiated a discussion about the helmets with UCA1.

16. That same day, UCA1, made a consensual telephone call to Taylor at telephone number (626) 318-3787. The two discussed the shipment of HGU-68/P and HGU-55/P Fighter Pilot helmets. UCA1 stated that if TAYLOR could send one complete helmet, so UCA1 could show his customer that he can get it, then he would need 10 or 20 more. Taylor stated that he could not obtain10 or 20 of the HGU-68/P helmets, but that he had a supplier for the HGU-55/P shells and could supplythem "all day long." Taylor stated that the military setup for the HGU-55/P would cost $900, with an additional $395 for the oxygen mask. Taylor stated that if UCA1 wanted to supply to someone in quantity, then the HGU-55/P is the way to go.

5

17. On or about August 11, 2008, UCA1 sent an e-mail to Taylor asking him about the communication options for the HGU-55/P military helmets. UCA1 further stated that he would be ordering the HGU-55/P from Taylor and asked Taylor what the exact amount would be for the shipment (including shipping charges) to the same address used as before . UCA1 stated that he would wire transfer the money to Taylor after the communications options for the helmet was confirmed.

18. On August 12, 2008, Taylor responded to UCA1 via e-mail and stated that either the HGU-55/P or the HGU-68/P helmets could be set up for civilian or military communications. Taylor stated that the price was $1295 for either the HGU-55/P or the HGU-68/P helmets with civilian communications and $995 for military communications. He further stated that overseas shipping was $52.

19. On or about August 15, 2008, UCA1 responded to Taylor via e-mail and asked Taylor if he could purchase the HGU-55/P helmet with military communications, the oxygen receiver mask, and the dark visor. UCA1 stated that he would wire the $1,047 USD to Taylor if Taylor sent him the banking information,. UCA1 also asked Taylor how he would label the package for Customs.

20. On or about September 9, 2008, UCA1 made a consensual telephone call to Taylor at telephone number (626) 318-3787. Taylor stated that his bank was Washington Mutual Savings, 700 West Huntington Drive, Arcadia, CA 91007. He provided a Routing #xxxxx1627 and Checking Account #xxxxxx9539. UCA1 requested the shipment to again be sent to Vienna, Austria, which Taylor confirmed. Taylor stated that Austria had an import limit of $400, which Taylor explained was the maximum for which the package could be insured. Taylor stated that if the package could not be insured for the full value, it might as well

6

be labeled as a $100 collectible, thus saving them from duty payments, or capping such payments on $100 worth of goods. Taylor also stated that he could label the shipments as a gift, which would allow UCA to avoid paying a lot of duty taxes. The downside to that approach, however, is that the package would not be insured for the full value. UCA1 stated that he could not claim insurance on the item anyway. Taylor responded that UCA1 was correct as to UCA1's remark, and that the maximum amount of insurance was $400. Taylor stated that he never had any problems shipping packages overseas that way. UCA1 further stated that he considered the shipment to be a test helmet, and that when he ordered 10 or 20 additional helmets, UCA1 would have more specific details for Taylor. UCA1 then indicated that he would wire transfer $1,047 to Taylor.

21.     On or about September 10, 2008, ICE/Philadelphia wire transferred $1047.00 USD to Paul Taylor at Washington Mutual Savings Bank, 700 West Huntington Drive, Arcadia, CA 91007, Routing #xxxxx1627 and Checking Account #xxxxxx9539. This wire transfer was drawn on ICE/Philadelphia undercover bank account located in Wilmington, Delaware.

22.     On or about September 13, 2008, UCA1 received an e-mail from Taylor stating that he had received the wire transfer for the Large HGU-55/P helmet.

23.     On or about September 15, 2008, UCA1 sent Taylor an e-mail asking him to add two shamrocks on the helmet, along with an orange stripe in the middle. He further asked him to put the name "HOMER" on the helmet. UCA1 also asked if Taylor could make this an XL instead of a large helmet. UCA1 further stated that if Austrian Customs stopped the package, they would just think that it was a joke.

24.     On or about October 27, 2008, Taylor sent an e-mail to UCA1 stating that the HGU-55/P helmet was ready to be shipped. Taylor also stated that he would send

UCA1 photos of the helmet. Taylor asked UCA1 to approve the helmet photos and also asked UCA1 for the shipping address again.

25. On or about November 4, 2008, UCA1 sent an e-mail to Taylor and provided him with the same shipping address in Vienna, Austria, that was used for the Anti-Gravity suit.

26. On or about November 12, 2008, UCA1 sent an e-mail to Taylor stating that the helmet looked "brilliant" and asked Taylor to ship it and send UCA1 a tracking number.

27. On or about November 12, 2008, Taylor sent e-mail to UCA1 stating that the helmet is on its way and provided a United States Postal Service tracking number, CJ298200565US.

28. On November 12, 2008, Taylor sent an e-mail to UCA1 stating that the helmet is on its way and provided a United States Postal Service tracking number, CJ298200565US.

29. On or about November 13, 2008, UCA1 received an e-mail from the United States Postal Service (USPS), disclosing that Shipment # CJ29 8200 565U S was sent from Arcadia, CA on November 12, 2008 at 1653 hours.

30. On or about November 20, 2008, ICE/Vienna, Austria received the shipment sent by Taylor. The shipment contained the one HGU-55/P Fighter Pilot Helmet that UCA1 ordered from Taylor. This helmet contained two green, three-leaf clovers on either side, one green stripe and one orange stripe down the middle giving the appearance of the Irish flag and further displayed "Ganno" on the rear of the helmet in green letters.

31. On or about December 15, 2008 UCA1 sent email to Taylor stating that his customer received the helmet. He also stated that his customer wanted the complete helmet with oxygen mask. He further asked Taylor to send a military oxygen mask to

8

Vienna, in order that his customer could test it prior to ordering a larger quantity.

32.   On December 15, 2008, Taylor responded to UCA1's email and stated that he thought the order was only for the helmet. Taylor stated that he had used MBU-12oxygen masks that were in good shape and brand-new MBU-20oxygen masks. He quoted $345 for the MBU-12s and $450 for the MBU-20s. He stated that shipping would be $24 priority mail. He also stated that either mask was compatible with the HGU-55 helmet. Taylor stated that he had about 6 of the MBU-20s and 3 of the MBU-12s. Taylor asked if the cords (i.e., the communications system for the helmet) needed to be the standard NATO type or if there was a different cord required. Taylor also stated that if UCA1 provided the type of aircraft they were going to be used on, then TAYLORcould figure out which type to send.

33.   On or about December 19, 2008, UCA1 sent an email to Taylor. UCA1 stated that he spoke with his customer and that the helmet and mask were to be used in the F-16. He further stated that his customer was happy with the helmet shell, but needed the oxygen mask to test it prior to the larger purchase. UCA1 stated that he wanted Taylor to ship whatever mask he thought would be best as a working model. UCA1 further stated that he just wanted to prove to his customer that he has a reliable supplier in America from whom he can get merchandise without the paperwork. UCA1 also asked Taylor if he could keep the masks that he had in order that he could purchase them in the future since they were hard to come across. UCA1 asked Taylor what cord he recommended for the masks.

34.   On or about December 20, 2008, Taylor stated that he recommended the MBU-20/P and that he would make sure it had the correct cord. He further provided the total price of $479 USD, including shipping cost.

35.   On or about December 23, 2008, ICE/Philadelphia received the shipment containing the HGU-55/P from ICE/Vienna, Austria. ICE SAC/PH subsequently stored the HGU-55/P as evidence.

36.   On or about January 5, 2009, UCA1 sent email to Taylor to confirm Taylor's banking information of: Washington Mutual Services; 700 Huntington Drive; Arcadia, CA 91007; ABA/Swift Code: xxxxx1627; Account# xxxxxx9539.

37.   On January 5, 2009, Taylor confirmed, via email, that the banking information was correct.

38.   On or about January 6, 2009, ICE SAC/PH, acting in an undercover capacity, wire transferred $479.00 USD to Paul Taylor at the above-listed bank account for one MBU-20/P oxygen mask. This wire transfer was drawn on ICE/Philadelphia undercover bank account located in Wilmington, Delaware.

39.   On or about January 6, 2009, UCA1 sent email to Taylor stating that he wired the money to him earlier that day. UCA1 further stated that there was a problem with the shipping address and informed Taylor to hold off on shipping them until UCA1 provided a new address.

40.   On or about January 6, 2009, Taylor sent email to Taylor that he would hold the mask until he heard from UCA1. Taylor also stated that masks were really in demand and he had four of them. Taylor asked UCA1 how soon he would need the other oxygen masks.

41.   On or about January 13, 2009, UCA1 sent email to Taylor and informed him that he would have a new address for Taylor soon. UCA1 further stated that he would be in Los Angeles during the week of January 26, 2009. UCA1 asked if Taylor was

10

available to meet for lunch to talk about some business.

42.   On or about February 2, 2009, Taylor and UCA1 met for lunch at the City Club in Los Angeles, CA, during which they had an extensive conversation.

a.   During this meet, UCA1 asked Taylor if he had any more of the oxygen masks. Taylor responded that he had two MBU 20/Px and that UCA1 could purchase them for $450 USD each. Taylor asked UCA1 where he wanted them shipped. UCA1 responded that he did not know where yet. Taylor stated that the MBU 20/Ps were the ones with the hoses coming out of the side. Taylor asked if these are going overseas. UCA1 responded yes. Taylor stated to add an additional $25 USD for shipping to Vienna. Taylor told UCA1 to make the check for a total of $925 USD for both masks and that he would put these in with the other one that he purchased.

b.   UCA1 asked if Taylor would be able to ship them to Slovenia. Taylor stated that he did not know and that he wanted to know what they are being used for. Taylor further stated that he was concerned that an enemy of the United States would use them. UCA1 stated that he could not promise that an enemy of the U.S would not use them. UCA1 stated that it is kind of the nature of what he does. UCA1 further stated that if Taylor was not comfortable shipping this, then he didn't have to. UCA1 further stated that this was the reason he wanted to meet in private to talk about what he does. UCA1 further stated that this is also the reason that he wanted to avoid the license issue. UCA1 further stated that his customers are unable to get the products that UCA1 can provide. UCA1 stated his customers cannot get licenses for these products or end-user certificates. UCA1 stated that he did not know where they would end up. He stated that they could end up in Venezuela or in any country that uses these products or has American aircraft.

11

c. Taylor stated that the problem is that the U.S. sold stripped down versions of the F-14 to Iran. UCA1 stated that that was when America was friends with Iran. Now, they are not friends with America, and his customers cannot get a license. UCA1 stated that this is the reason that he does what he does and that what he does is illegal. UCA1 stated that he wanted to be upfront with Taylor and did not want Taylor doing anything that he was not comfortable doing. Taylor stated that he is comfortable doing it to an extent.

d. Taylor stated that he was already visited by NCIS. Taylor stated that he had a few helmets on eBay that raised a few eyebrows. The helmet he stated was basically advanced technology and should not have been on the open market and NCIS wanted to know where he got it. Taylor further stated that he would be on NCIS'S hotlist. UCA1 stated that this is why he wanted to meet with Taylor today and talk about what they needed to do to stay off the radar. Taylor stated that, regarding the masks, he would do it this time because they were his last two masks. Taylor also said that if he could find them on eBay and if he could make $50 to $100 apiece profit, then he would sell them to UCA1.

e. As far as the helmets went, Taylor said he would sell them to UCA1 all day long and that he didn't care where they were going and that he wasn't going to ask any questions. Taylor stated that if they were to be used in aircraft that are compatible with that helmet, then he is going to assume that it is not going to be used by an enemy of the United States. Taylor then stated, "That's the story I'm sticking to". Taylor stated that he used to have really good connections in the Navy, which is where he got the G-Suits from. He stated that the G-Suits were never brought up by NCIS. Taylor stated that since he was visited once by NCIS for the helmet, he would

12

be on the tip of their tongue. UCA1 stated that is why he wanted to speak with Taylor. UCA1 further stated that when UCA1 and Taylor first spoke, Taylor stated that he didn't care if they visited him and laughed about it because he was just trying to make a couple bucks. UCA1 stated that he knew what he was doing was illegal and that he didn't want to go to jail. UCA1 further stated that he wanted Taylor to understand upfront what he was doing. Further, UCA1 stated that if Taylor was not comfortable doing this, then he should wash his hands and walk away.

f. UCA1 further stated that he wanted to make sure that Taylor was comfortable doing this in case someone does visit Taylor, UCA1 did not want Taylor to give up UCA1's name. UCA1 stated that he wanted at least 20 more helmets. UCA1 stated that he had a freight forwarder that Taylor could use in order to distance himself from the shipment. Taylor asked UCA1 if he could at least have him send it to a friendly country. Taylor stated that UCA1 had to have a connection in a friendly country. UCA1 asked Taylor if he could send it to Vienna. Taylor stated that Vienna was fine to ship to. He further stated that he didn't want to know the rest of the details.

g. Taylor stated that UCA1 is telling him that he can't guarantee where it is going. UCA1 stated that he could not guarantee where these shipments would end up. Taylor stated that if he sells it to Vienna, then that it's all he cares about. UCA1 further stated that he could not just go online and order these Gentex[2] helmets and they couldn't guarantee where they would end up. UCA1 stated that he didn't know how Taylor was getting the helmets and didn't care to know. Taylor stated that he had a connection that gets him brand new Gentex shells. Taylor stated that his contact acquires them legally, and that they are past their five year

---

[2] Gentex is the manufacturer for the HGU series of helmets.

expiration date, but are still brand new in the box. UCA1 stated that anything he can get his hands on that is American military, he has interest in. UCA1 asked if the helmets had serial numbers on them. Taylor stated that the only way it could come back to him is if Taylor puts his "CUSTOM FLIGHT HELMETS" business label on it, but he stated that he doesn't put the business label on the lightweight mask receiver helmets. UCA1 stated that the one Taylor shipped to UCA1 with the shamrocks on it looks like a motorcycle helmet in the pictures and, if it got stopped, UCA1 hopes no one would think anything of it. Taylor stated that is why he puts "safety helmet" on the Customs Form as opposed to what they really are. Taylor stated that he would not ship these in bulk. Taylor stated that he was unsure of the Customs laws in Vienna. Taylor stated that he could probably do two or three per week. Taylor stated that had no problem shipping two or three, but that shipping two at a time would not help keep them off the radar. He further stated that shipping one at a time would be better to keep from being detected.

h. UCA1 stated that his biggest concern was getting them out of the United States. UCA1 asked if there was any way Gentex would sell him the helmets. Taylor confirmed that they would not. Taylor stated that as far as the helmets go, there are no serial numbers on them. Taylor stated that the oxygen masks do have serial numbers on them, but they can be removed. UCA1 asked if Taylor could remove the serial numbers from the masks. Taylor stated that after today's meeting, he would definitely remove them. Taylor stated that guys on eBay were getting wind and starting to reference the end-user statement just to cover their ass and state they will not ship outside the United States. Taylor stated that he thinks some are very paranoid. Taylor stated that he is not too worried, because they are not selling nuclear weapons. UCA1 reiterated that he doesn't want to go to jail.

i. UCA1 further explained to Taylor that he is dealing with other people

14

besides Taylor. UCA1 asked what countries Taylor was comfortable shipping to. Taylor stated that any country that is not an enemy of the United States was fine with him. Taylor stated that any country in Western Europe is fine with him. UCA1 asked if Taylor was ever in the military. Taylor stated that he tried to get into the Air Force, but they looked at his driving record and thought he had a problem with authority.

j.   UCA1 provided a check to Taylor for $925 USD for the oxygen masks. UCA1 further explained that the check was from a bank in Delaware where his company was incorporated. UCA1 further stated that as soon as he got a good address to ship the masks, he would provide it to Taylor.

k.   Taylor stated that, after the incident with NCIS, U.S. Customs stopped him on the way back into the United States from a cruise. He further stated that this is how he knew that he had been "flagged". UCA1 stated that if Taylor could think of anything else to do to keep them safe, Taylor should suggest it. Taylor stated that he doesn't see any problem shipping the helmets. He has shipped them all over the world, except the Middle East. He has shipped to China, Japan, England, Ireland, France, Germany, Italy, and all over Europe. UCA1 stated that he had the same concerns that Taylor had and UCA1 didn't want this stuff going into the hands of an enemy of the United States, but he could not guarantee it wouldn't and, if Taylor wanted to walk away, then he understood. Taylor stated that if UCA1 would have told him that the helmets were going to Iran to help them get their F-14 aircraft up and running, then Taylor would have told UCA1 thanks for your time. Taylor would have asked UCA1 for the address in Vienna and still would have shipped the helmets to UCA1, but would have walked out on UCA1. Taylor further stated that UCA1 was not telling him anything directly. UCA1 stated that is because he does not know and that they could be going there. Taylor stated that it is a lot better that way.

(Referring to not knowing where they are going.) UCA1 stated that he wanted Taylor to know that. Taylor stated that UCA1 told him that these were being used in F-16 and that Taylor did the mental inventory. Taylor stated that he had a feeling and he's not stupid. Taylor further stated that he is from the streets.

43.     During this undercover meeting, UCA1 provided a check to Taylor for payment in the amount of $925.00 USD for the MBU 20/P oxygen masks. This undercover bank account is located in Wilmington, Delaware.

44.     On or about February 13, 2009, UCA1 sent email to Taylor providing Taylor with a shipping address in Hong Kong. UCA1 further asked Taylor to let UCA1 know if he came across anything of interest and also asked Taylor to provide the tracking number for the oxygen masks when he received it.

45.     On or about March 5, 2009, Taylor sent an email to UCA1 stating that he had an F-14 Tomcat Ejection Seat and asked if UCA1 was interested.

46.     On or about March 10, 2009, UCA1 made a consensual telephone call to Taylor at telephone number (626) 318-3787. The two discussed the purchase and shipment of the F-14 Ejection Seat.

47.     On or about March 10, 2009,UCA1 received a consensual telephone call from Taylor at (626) 318-3787. Taylor stated that the guy who had the F-14 Ejection Seat just call him back and told him the model number of the seat is GRU-7A, used in the F-14 Alpha/Bravo model, the A or the B Tomcat. He stated that the seat had everything in it, including the parachute, harness with fittings and inertia reels. The only thing missing is the rockets. Taylor further stated that the seller wanted $14,000 USD. Taylor stated that he was going to get pictures sent to Taylor and that he would send them to UCA1.

16

Taylor stated that the condition was excellent. He further stated that nothing had been cut or demilitarized, the term used to describe items that are rid of military characteristics. Taylor stated that the guy had it prior to 9/11 and that it was pulled out of a Tomcat. The rockets were cut out of it and then his guy bought it. Taylor stated that this guy is a pretty hardcore collector and that most of his stuff is in good condition as he is pretty fussy. Taylor stated that he was leaving for England on March 31 for two weeks. UCA1 stated that he would try to get the money to him before he left for England, but if not, he would get it to him when Taylor returned. Taylor stated he would have to figure out how much the shipping would cost. UCA1 stated that they would have to do some creative thinking in reference to the shipping of the Ejection Seat. Taylor suggested that he would have to build a crate in order to ship it. Taylor stated that they do things like this for movie props and that it could go that route to avoid any problems. Taylor further stated that technically, it is an inert seat. UCA1 stated that he would get the money to him first and then they could figure out the logistics of shipping it.

48.     On or about March 10, 2009, UCA1received an email from Taylor. This email contained four attachments. These attachments revealed pictures of the F-14 ejection seat.

49.     On or about March 10, 2009, UCA1 sent email to Taylor stating that the ejection seat looked good and asked what the cost would be to Austria. UCA1 also stated that he would know in the next few days if he would be able to send the money to Taylor. Referring to the photographs sent by Taylor, UCA1 asked what the other seat was in the photograph. TAYLOR replied that it was for an F-4 Phantom.

50.     On or about March 13, 2009, UCA1 received email from Taylor. Taylor stated that the shipping costs for the ejection seat were unknown, but he estimated between $200 and $300 USD.

17

51.    On or about March 17, 2009, UCA1 received email from Taylor stating that he had a quote for shipping the ejection seat. Taylor stated it would take 31 days by ship, the cost would be $491 USD, and that it would need to be picked up at the seaport in Vienna. Taylor also stated that air shipment would take 6 days and would cost $977 USD. Taylor also stated that because of the size of the crate, it would have to be picked up.

52.    On or about March 19, 2009, UCA1 sent email to Taylor asking for a quote to ship the F-14 ejection seat to an address UCA1 provided in Denmark.

53.    On or about March 19, 2009, UCA1 received email from Taylor stating that the cost to ship the ejection seat to Denmark was $684 USD by air or $397 USD by ship.

54.    On or about March 23, 2009, UCA1 sent an email to Taylor stating that he was ready to wire Taylor 30% of the total cost and that his customer definitely wanted the item. UCA1 further stated that he knows Taylor said it was never demilitarized, but that there was some worry from his client. UCA1 further asked that since it is a fully functioning ejection seat, "what would you put on this paperwork for this?" UCA1 stated that he was certain that this ejection seat needs a license and that they both did not want the shipment stopped. UCA1 asked what Taylor suggested.

55.    On or about March 23, 2009, UCA1 received email from Taylor stating that Taylor verified that the seat had everything intact with the exception of the rocket motors. The F-14 ejection seat had all the oxygen system hoses present, inertia reels operative, koch fittings, and the fully stoked survival kit under the seat. Taylor further stated that the parachutes would probably have to be re-packed as the date of last inspection was bound to be out of date. Taylor stated that, regarding the license, he was unsure what the requirements were for the ejection seat, and that he

18

would need to check into that. Taylor stated that he was headed to London in a week and if they did not get it squared away prior to his trip, Taylor would handle it when he returned. Taylor jokingly stated that he wondered if there were any restrictions about taking it with him to London. Taylor stated that it was probably easy to ship to Europe from the UK if he could take the seat on the plane as excess baggage.

56.     On or about March 25, 2009, UCA1 received email from Taylor stating that his customer was anxious to move things along and that he was willing to drop the price of the ejection seat to $13,500 USD if they could complete it before Tuesday.

57.     On or about April 10, 2009, UCA1 made a consensual telephone call to Paul Taylor at telephone number (626) 318-3787.  Taylor stated that he was willing to go $13,500 for the seat and that the guy with the ejection seat would cover shipping costs as well. Taylor stated that it would still be $13,500.00 USD. UCA1 stated that he would send Taylor $8,000.00 USD on Monday, leaving a balance of $5,500.00. Taylor stated that he thinks everything is going to be fine. Taylor further stated that the seat was complete except for the rockets. TAYLOR stated that as far as using the ejection seat, he thinks it should be a go. Taylor stated that his guy got it before 9/11. UCA1 asked if it could be used in an aircraft. Taylor stated that he thought it would be no problem. Taylor stated that the only thing that needed to be done was to re-certify and re-pack the parachute. Taylor also stated that whoever was UCA's customer would probably know someone who could certify and re-pack the parachute. UCA1 asked if Taylor's friend was going to ship it or if Taylor would ship it. Taylor stated that he would ship it himself. Taylor further stated that this is where he intended to make money in the shipment of the ejection seat. UCA1 asked what the

19

ejection seat would be labeled for shipment. Taylor stated that they use a lot of these aircraft seats for movie props so he would just label it as a movie prop. UCA1 verified that Taylor was going to label it aircraft seat/movie prop. Taylor responded that he would label it vintage aircraft seat. UCA1 stated, "we're not gonna, obviously, not say what it really is, right?" Taylor responded, "No". UCA1 asked if they would just leave it vague. UCA1 stated that doing it this way would prevent them from having to worry about the paperwork again. Taylor stated, "Exactly". Taylor further stated that he would lay the thing down on its back and make a crate that will look like a coffin. UCA1 then stated that he was going to try to send Taylor the entire amount on Monday. Taylor stated that if he could do that, then Taylor could have it sent by Friday.

58.     On or about April 13, 2009, ICE/Philadelphia wire transferred $13,500.00 USD to Paul Taylor for the F-14 Ejection Seat to Washington Mutual Savings Bank, 700 West Huntington Drive, Arcadia, CA 91007, Routing #xxxxx1627 and Checking Account #xxxxxx9539. This wire transfer was drawn on ICE/Philadelphia undercover bank account located in Wilmington, Delaware.

59.     On or about April 22, 2009, UCA1 received email from Taylor. Taylor attached three photographs of a crate. The photographs of the crate had the following markings on it in black:

> "FOR MUSEUM DISPLAY ONLY"
> "CONTAINS ONE VINTAGE AIRCRAFT SEAT FOR GLOSTER METEOR MK IV"
> "MADE BY THE MARTIN BAKER CO., MIDDLESEX, ENGLAND"

60.     On or about April 22, 2009, UCA1 received email from Taylor stating that the shipper will email him the bill of lading when he updates the info UCA1 provided to him that day Taylor stated, "About the box I felt a little creativity may make things go a little more

20

smoothly. Let's hope it works."

61.    On or about May 8, 2009, UCA1 received a telephone call from
Taylor. UCA1 stated that the pictures of the crate were brilliant and that, after seeing
them, he was not at all concerned. UCA1 referenced the "made in England" writing on
the crate. Taylor stated that it was like something out of Indiana Jones. UCA1 asked if
Taylor had done that before or if he just came up the idea. Taylor stated that he was very
creative. UCA1 stated that he was very impressed and that it was quick thinking.
Taylor stated that the Meteor (an older British Aircraft model) uses an ejection seat too, so as
long as there are no ejection seat experts working at Customs, they should be alright. UCA1
asked if Taylor said the media/movies use the seat. Taylor stated that he said the vintage plane,
Gloster Meteor from the 1950's. UCA1 stated the he didn't know anything about planes and
asked if that is why he put "vintage" on the crate, so if Customs opens it, they won't know the
difference. Taylor stated, "Hopefully yeah." UCA1 stated that he didn't think they would
know the difference. Taylor stated that he didn't think so either. The shipper asked him
what the value was. Taylor stated "I just told him it was a few hundred bucks, ya know
because when you start declaring, ya know, thousands of dollars worth of value, they're
gonna for sure open it." Taylor further stated, "As far as I can see, the only thing that
would stop that crate from getting to Denmark would be fucking pirates."

62.    On or about May 8, 2009, UCA1 received a telephone call from Taylor.
UCA1 asked Taylor if he knew anyone else that sells similar items now that his guy is
leaving. Taylor stated that things come up all the time. Taylor stated that weird things
happen to him all the time and that one door closes and another opens and that they
would just have to wait and see. UCA1 stated that this is why he knows that Taylor is

21

the man for the job.  UCA1 told Taylor to give him a call if he hears of anyone else doing the same things.  Taylor stated that he would and told UCA1 to give him a call if he comes into the area.

63.    On or about May 28, 2009, ICE/Denmark received the shipment sent by Taylor.  The shipment contained the GRU-7A, F-14 Ejection Seat.

64.    On or about July 27, 2009, ICE/Philadelphia received the shipment from ICE/Denmark where it was stored as evidence.

65.    On August 8, 2009, UCA1 received an email from Taylor stating UCA1 should use the email address, tmaddmaxx@aol.com, ("Madmaxx email") as he uses this more frequently. Taylor and UCA1 exchanged emails periodically between that date and November 23, 2009.

66.    Between November 23, 2009, and November 24, 2009, UCA1 and Taylor exchanged a series of five emails regarding UCA1's proposed purchase of additional helmets. All of Taylor's emails were sent or received from the Madmaxx email account.

67.    In the emails, UCA1 stated that he had a customer who was interested in purchasing between 25 to 30 helmets and wanted to know whether Taylor could travel to Philadelphia to discuss the helmets with him.  UCA1 offered to pay for Taylor's flight and hotel stay.

68.    Tayor responded from the Madmaxx email account that an "order of 25+ would be great. Ive been considering stepping up production to a new level with new tooling for the shells and parts etc and an order like this would get me off to a great start." Taylor requested that UCA1's customer provide a 50% down payment on an order of 25 helmets, in which he could get the customer better pricing, expand his own business, and cut down production costs.

22

Taylor further stated that he had some free time on December 9-11, 2009, to travel. As to the particular helmet type for UCA1's customer to purchase, Taylor stated, "I'd prefer to push the HGU-55. Its a lightweight helmet with a fairly simple design and combat proven in about 99% of today's NATO forces."

69.     UCA1 purchased a US Airways ticket for Taylor from Los Angeles to Philadelphia. Taylor took the flight and arrived in Philadelphia on December 10, 2009.

70.     Prior to meeting with UCA1, Taylor sent an email from his Madmaxx account to UCA1 in which he stated that he had access to two additional ejection seats for F-series fighter planes.

71.     UCA1 met Taylor at the airport and drove him to a hotel in Wilmington, Delaware. During the ride from the airport to the hotel, Taylor and UCA1 discussed UCA1 purchasing additional ejection seats from Taylor. The two also discussed the planned impending purchase of 30 helmets by UCA1's customer in Wilmington. Taylor stated that he was concerned about depositing large quantities of U.S. currency into his bank account for tax purposes. Taylor also told UCA1 that he had access to Czechoslovakian "trainer" planes, which did not need a license to export because they were not made in the United States. UCA1 informed Taylor not to discuss pricing in front of his customer.

72.     During the drive to Wilmington, Taylor used his Blackberry cell phone to communicate with individuals he described as his ejection-seat suppliers in Texas. Taylor told UCA1 that he texted his supplier for a price on the ejection seats. Taylor then told UCA1 that received a text back from his supplier, in which his supplier stated that he did not have a price yet because he was awaiting an answer from his direct supplier.

73.     UCA1 and Taylor arrived at the hotel in Wilmington, where they met with another Government Undercover Agent (hereinafter referred to UCA2) in a hotel room. Taylor brought a helmet to the meet and explained to UCA2 the helmet's capabilities in detail. He said that the helmet was identical to the type of helmets the United States Navy uses in all of their fighter jets, and instructed UCA2 as to how the helmets were used. Taylor told UCA2 that the helmet was constructed will full military specifications. Taylor then gave UCA2 several brochures about the helmets.

74.     UCA2 stated that he had clients in Europe and the Middle East and asked whether Taylor could ship products to Dubai. Taylor indicated that it would not be a problem. UCA2 said that his clients would pick up the products in Dubai and take them across the Gulf. Taylor told UCA2 that he had an F-4 fighter ejection seat for sale, to which UCA2 responded that such items were like gold dust to his clients. UCA2 explained that, since the "embargo," his client had not been able to obtain such items.

75.     Taylor offered UCA2 thirty helmets for sale. Taylor further indicated that he had oxygen masks and military communications components for sale. He agreed to a payment of $30,000 for 30 helmets. UCA2 told Taylor that, since the embargo and the fall of the Shah, all of these things (referring to the helmets) have been rotting. According to Taylor all of the communications were made in accordance with military specifications.

76.     UCA2 also agreed to purchase an F-14 ejection seat from Taylor that evening for $29,000. Taylor indicated that he would describe the item on any shipment as a vintage aircraft chair for museum display. (This was similar to how Taylor previously shipped the F-14 ejection seat to UCA1). Taylor stated that he would have to remove any decals or markings that

24

described the seat as a GRU-7 (the model number of the F-14 ejection seat). Taylor and UCA2 discussed that Taylor would agree to misidentify the F-14 ejection seat in order to avoid detection for an unlicensed export. Taylor indicated that he had no problem misidentifying the F-14 seat, and further agreed to undervalue the exported item in order to avoid the requirement to fill out a shipper's export declaration.

77.    UCA2 and Taylor discussed Taylor obtaining ejection seats for F-4 and F-16 fighter jets. UCA2 asked UCA1 to give Taylor a down payment to hold for the seats. UCA2 further stated that he would be interested in any and all parts on F-series fighter planes.

78.    During the meeting, Taylor opened up his HP Pavilion laptop computer to show UCA2 various photographs and documents regarding the F-4 seat, the design of the helmets, and oxygen masks. UCA2 told Taylor that he would order oxygen masks as well. UCA1 prepared numerous separate checks to provide to Taylor for payment for the three ejection seats, 30 helmets, and oxygen masks, which Taylor accepted. With respect to all of the payments, Taylor informed UCA2 that the price included Taylor shipping the products to the end destination in Dubai.

79.    Taylor further told UCA2 that he had five Czechoslovakian trainer planes for sale. Taylor stated that, if someone flew those planes, they could fly a MiG 29 fighter jet. Taylor indicated that, because the planes were manufactured in Czechoslovakia, and not in the United States, there would be no problems with shipping the planes without an export license.

80.    Following the meeting, ICE Special Agents arrested Taylor. Agents seized on his person the Blackberry Model 8100 cell phone that Taylor used to communicate with ejection-

seat associates in Texas. The phone number for the Blackberry was 626-318-3787, the same phone that UCA1 used to contact Taylor on multiple occasions.

81.     In addition, agents seized a Silver-and-black HP Pavilion laptop computer, model dv8000, serial number CND6282JWL.

## C.     Conclusion

82.     Wherefore, for the foregoing reasons, I assert that there is probable cause to issue a criminal complaint and arrest warrant for Paul Taylor for knowingly and willfully violating Title 22, United States Code, Sections 2778 (b)(2) and 2778 (c), and Title 18, United States Code 2, and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1(a)(1), by causing the export of United States defense articles without the requisite export license.

$H_{\omega} \omega^{i.f_1}$
_____

Harry C. Ubele
Special Agent
U.S. Immigration and Customs Enforcement

Dated: December 11, 2009

Sworn to and subscribed before me
on this _____ *11* _____ day of December 2009

_____

Hon. Mary Pat Thynge
United States Magistrate Judge

26